UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| v. | ) | No. | 93-cr-418-4 (TFH) |
| | ) | | |
| JOSE NARANJO, | ) | | |
| | ) | | |
| Defendant. | ) | | |
| _____ | ) | | |

## REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

Mr. Jose Naranjo, through undersigned counsel, hereby replies to the Government's Opposition to Defendant's Supplemental Motion for Compassionate Release Under 18 U.S.C. 3582(c)(1)(A)(i) ("Gov't Opp'n"), ECF No. 642. The government does not dispute that Mr. Naranjo's circumstances satisfy the "extraordinary and compelling reasons" standard. The government does not dispute that Mr. Naranjo's current sentence is greater than necessary to meet the purposes of sentencing. The government opposes Mr. Naranjo's motion solely on one procedural ground, arguing the motion "is not properly before the Court" "because 30 days have not passed since the Warden of the defendant's facility received the defendant's request, as required by statute." Gov't Opp'n at 1. As discussed below, the government's position is contradicted by the undisputed facts and not supported by the law. In addition, the COVID-19 pandemic adds special urgency to Mr. Naranjo's request because his age and health conditions, combined with his current custody conditions, put him at high risk of severe illness and death from COVID-19. Therefore, the Court should grant his motion for compassionate release as soon as possible.

I.      **Mr. Naranjo Submitted A Request to the Warden on April 15, 2019, and Then Again on December 20 and 21, 2019, and 30 Days Have Long Lapsed.**

The government's argument about the April 15, 2019 compassionate release request is unclear and nonsensical.  The government complains that the request form Mr. Naranjo submitted on April 15, 2019 was "*unsigned*" and also contends that Mr. Naranjo "did not actually submit" any request form to the Warden until April 8, 2020.  Gov't Opp'n at 4.  As an initial matter, the government does not explain why any signature is necessary to show that Mr. Naranjo made the request on April 15, 2019.  There does not appear to be any place on the form for Mr. Naranjo to sign.  And the lack of a staff member's signature on the April 15, 2019 request does not mean the request was not submitted and received by the Warden on or about that date.  Indeed, it is not uncommon for prison officials to refuse to "accept" compassionate release requests from inmates; yet, that does not mean the request was not received.  "[A] refusal to accept a request for release . . . should not deprive [Mr. Naranjo] of judicial review." *United States v. Tran*, No. CR 08-00197-DOC, 2020 WL 1820520, at *2 (C.D. Cal. Apr. 10, 2020) ("find[ing] that Defendant's multiple attempts to request release from the BOP, and the lack of action taken to adjudicate such a request, is a constructive denial of his request" and holding "[t]herefore, Defendant has exhausted his administrative remedies).

In response to the government, Mr. Naranjo's case manager, Amy Ruiz, did not deny that Mr. Naranjo made the April 15, 2019 request; the government does not proffer that Ms. Ruiz gave any indication that Mr. Naranjo "did not actually submit his request form to the Warden" on April 15, 2019.  Gov't Opp'n at 4.  Rather, on April 8, 2020, apparently after the government contacted her, Ms. Ruiz asked Mr. Naranjo to complete yet another compassionate release request and then provided it to the government.  This additional request is duplicative.  It in no

way shows that Mr. Naranjo "did not actually submit his [previous] request form to the Warden" on or about April 15, 2019.

Defense counsel understands that, on April 15, 2019, during "mainline," Mr. Naranjo approached Acting Warden Clemmons and submitted to her his "Inmate Request to Staff," colloquially referred to as a "cop-out," requesting compassionate release.  *See* ECF No. 626-2. Ms. Clemmons then handed it to Mr. Naranjo's Unit Manager, Mr. Smith, and Mr. Smith indicated that he would submit it to the Assistant Warden.

As other courts have held, a "prisoner mailbox rule" equivalent applies here.  *See United States v. Resnick*, 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020) (citing *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Hardy v. Conway*, 162 F. App'x 61 (2d Cir. 2006)); *United States v. Bess*, 2020 WL 1940809, *2 n. 2 (W.D.N.Y. Apr. 22, 2020).  Applying the prisoner mailbox rule, any prison official's "receipt of the document constituted the warden's receipt of the documents." *Resnick*, 2020 WL 1651508, at *6.  "Inmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk."  *Id.* "Unskilled in law, unaided by counsel, and unable to leave the prison, [Mr. Naranjo's] control over the processing of his [request] necessarily cease[d] as soon as he hand[ed] it over to the only public officials to whom he ha[d] access—the prison authorities—and the only information he will likely have is the date he delivered the notice to those prison authorities[.]"  *Houston*, 487 U.S. 271-72; *Bess*, 2020 WL 1940809, *2 n. 2.  The government offers no reason why Mr. Naranjo would have typed and dated his request April 15, 2019, and waited until June 3, 2019 to mail his *pro se* motion to the Court, "but not submitted it that same day."  *Id.*

Moreover, out of an abundance of caution, Mr. Naranjo re-submitted his request on December 20 and 21, 2019.  *See* Exhibit C, Emails to Unit Management from Jose Naranjo (Dec.

20 & 21, 2019).[1]  The BOP website expressly says that inmates may apply for compassionate

release "by making a request to their Unit Team.  The request will be reviewed by the Warden

and, ultimately, the BOP Director will determine whether approval of the request is appropriate."

*First Step Act – Frequently Asked Questions*, Fed. Bureau of Prisons,

https://www.bop.gov/inmates/fsa/faq.jsp#fsa_compassionate_release.  Accordingly, thirty days

have long "lapse[d]" since the receipt of that request by the Warden.  18 U.S.C. § 3582(c)(1)(A).

This is additional, dispositive evidence that Mr. Naranjo submitted his request well over 30 days

before defense counsel filed the supplemental motion on his behalf.

       Contrary to the government's assertion (Gov't Opp'n at 4), the Court can excuse the 30-

day waiting period, particularly in the current unprecedented extraordinary circumstances

presented by the COVID-19 pandemic.  *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL

1821988, at *3-4 (S.D.N.Y. Apr. 13, 2020).[2]  Excusing the administrative exhaustion

requirement would be warranted here because of Mr. Naranjo's vulnerable age and medical

conditions and the alarming speed at which COVID-19 is spreading through prisons, discussed in

---

[1]  Defense counsel had not yet received these documents at the time of filing the supplemental
motion.

[2] *See also United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *4 (S.D.N.Y.
Apr. 14, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *2
(S.D.N.Y. Apr. 13, 2020); *United States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851
(E.D.N.Y. Apr. 10, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL
1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few
weeks' delay carries the risk of catastrophic health consequences" for prisoner in high risk
group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y.
Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health
conditions putting him in a high risk group for complications and death resulting from COVID-
19, and fact that he was in a detention facility where prisoners live in crowded conditions);
*United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020)
(reasoning delay carried the risk of the vulnerable defendant contracting COVID-19); *United
States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (finding that "requiring
defendant to first seek relief through the [BOP] administrative process would be futile").

more detail below.  However, the Court need not excuse the requirement here, because it was satisfied.

The government's assertion that BOP's "assessment" of a compassionate release request "will always be of value to the parties and the Court," Gov't Opp'n at 4-5, is undermined by the First Step Act's amendment to § 3582(c)(1)(A).  The amendment to the compassionate release statute was Congress's response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered" or being unjustifiably rejected.  U.S. Dep't Justice, *Fed. Bureau of Prisons' Compassionate Release Program*, p. 11 (2013);[3] *see generally* Stephen R. Sady &Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 Fed. Sent'g Rep. 167 (2009); Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019).  Changing the law to permit prisoners to file the motion for a reduction in sentence, the First Step Act entitled this section "Increasing the Use and Transparency of Compassionate Release."  164 CONG. REC. H10358 (daily ed. Dec. 20, 2018).  Senator Cardin noted the Act made several reforms to the federal prison system, including "expedit[ing] compassionate release applications."  164 CONG. REC. S7774 (daily ed. Dec. 18, 2018).  Congressman Nadler noted that the Act included "a number of very positive changes, such as . . . improving application of compassionate release,

---

[3] More specifically, the Inspector General found the BOP: (1) failed to provide adequate guidance to staff regarding the medical and nonmedical criteria for compassionate release consideration; (2) had no timeliness standards for reviewing compassionate release requests, and timeliness standards for inmate appeals do not consider the special circumstances of medical compassionate release requests; (3) did not have formal procedures to inform inmates about the compassionate release program; and (4) failed to have a system to track compassionate release requests, the timeliness of the review process, or whether decisions made by institution and Regional Office staff are consistent with each other or with BOP policy.  *Id.*

and providing other measures to improve the welfare of federal inmates."  164 CONG. REC. H10361-H10362 (Dec. 20, 2018).

Also, "[i]mportantly, § 3582(c)(1)(A)" as amended "does not contain an exhaustion requirement in the traditional sense.  That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court.  Rather, it requires the defendant either to exhaust administrative remedies *or simply to wait* 30 days after serving his petition on the warden of his facility before filing a motion in court."  *Haney*, 2020 WL 1821988 at *3 (some emphasis added).  Thus, "Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial.  Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course."  *Id*.

Accordingly, contrary to the government's assertion, the Court need not and should not give the BOP "the opportunity to assess whether the defendant should be released."  Gov't Opp'n at 5.[4]

---

[4] "The most the government could stand to gain . . . would be to forestall the inevitable, to say nothing of the lives it would jeopardize and the resources it would waste in the meantime by litigating the issue and requiring [this Court] to issue two decisions[.]"  *Bess*, 2020 WL1940809 at *4.

II.    **The COVID-19 Pandemic Adds Special Urgency to Mr. Naranjo's Request Because He is at High Risk of Severe Illness and Death from COVID-19.**

The current COVID-19 pandemic constitutes another extraordinary and compelling reason to grant Mr. Naranjo immediate compassionate release.[5]  Mr. Naranjo's age, chronic ear infections, and high blood pressure put him squarely within one of the most at-risk populations for this virus.  *See* Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, nytimes.com (Mar. 12, 2020; updated Mar. 14, 2020).  That COVID-19 poses a fatal risk to people 65 years of age and older or those with preexisting conditions is not subject to reasonable dispute.  *See* Centers of Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Are You at High Risk for Severe Illness?* (March 12, 2020), https://bit.ly/2vgUt1P; World Health Organization, *Q&A on coronaviruses (COVID-19)*, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (those at greater risk from COVID-19 include "older persons and persons with pre-existing medical conditions (such as high blood pressure, heart disease, lung disease, canceror diabetes)" (March 9, 2020)); *see also Bess*, 2020 WL 1940809, at *8 ("This Court already has taken judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality." (quotation marks and citation omitted)).

Mr. Naranjo falls squarely within one of the most at-risk populations for this virus.  *See* Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, nytimes.com (Mar. 12, 2020; updated Mar. 14, 2020).  The fatality rate of COVID-19 is highest in men and

---

[5] The fact that there is a COVID-19 pandemic is a factual matter of which the Court can and should take judicial notice.  *See Thornton v. United States*, 271 U.S. 414, 420 (1926) (court can take judicial notice of Secretary of Agriculture's quarantine of cattle regulations); Evid. Rule 201 ("court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction.").

increases with advancing age, rising precipitously after the age of 50.  *See* Exhibit D, Decl. of

Mark Stern, Correctional Health Expert (Mar. 15, 2020), at ¶ 5; Exhibit E, Decl. of Jonathan

Louis Golob, Asst. Professor, Univ. of Mich. School of Medicine (Mar. 13, 2020), at ¶ 3, 14

(those over age 70 "are at grave risk of severe illness and death from COVID-19");[6] *see also*

CDC COVID-19 Response Team, *Severe Outcomes Among Patients with Coronavirus Desease*

*2019 (COVID-19) – United States, February 12- March 16, 2020*, Morbidity and Mortality

Weekly Report (Mar. 27, 2020).[7]

Individuals like Mr. Naranjo, a male over age 70 with underlying hypertension, are "at

highest risk for severe disease and death."  *See* World Health Organization, *Report of the WHO-*

*China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020) ("WHO

Report"), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-

covid-19-final-report.pdf; Centers of Disease Control and Prevention, *Coronavirus Disease 2019*

*(COVID-19) Are You at High Risk for Severe Illness?* (March 12,2020), https://bit.ly/2vgUt1P.

"Older persons, men, and those with pre-existing hypertension and/or diabetes were highly

prevalent" in the first large case study of "sequentially hospitalized patients with confirmed

COVID-19 in the US," indicating that such persons are among the most likely to require

hospitalization from COVID-19.  Safiya Richardson et al., *Presenting Characteristics,*

*Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New*

*York City Area* at E7, JAMA (Apr. 22, 2020), doi:10.1001/jama.2020.6775.  In that study, the

most common comorbidity was hypertension, present in 56.6% of the 5,700 patients studied.  *Id.*

---

[6] These declarations were prepared in other cases, but their facts and recommendations apply to
all high-risk individuals in detention facilities.

[7] Available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e2-H.pdf.

at E3.  The study also found that over 35% of the men aged 70 to 79 who were hospitalized with

COVID-19 died.  *Id*. at E5 (Table 4).

Aside from age, researches are finding that "hypertension could be one of the leading

factors" in coronavirus deaths.  Emily Bamforth, *Hypertension could be a leading factor in*

*coronavirus deaths: Here's what to know*, Cleveland.com (Mar. 12, 2020, 6:52 a.m.).

> A recent study published in peer-reviewed journal, Lancet, studied 191 patients in
> China.  About 58, or 30 percent, had hypertension.  But among the 54 who died
> from complications from coronavirus, 48 percent had hypertension, opposed to 23
> percent in those who survived.  A top Chinese intensive care doctor told
> Bloomberg that of 170 patients who died in January in Wuhan, nearly half had
> hypertension, and anecdotally he said that he and other doctors have noticed
> hypertension is prevalent in those who die.

*Id*.; *see* Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with*

*COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (Mar. 11, 2020),

https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext; *see also*

Kashmira Gander, *Coronavirus Death Risk Could be Higher for Patients with High Blood*

*Pressure*, Chinese COVID-19 Doctor Claims, newsweek.com (Mar. 11, 2020; 6:13 a.m.); Wei-

jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A*

*Nationwide Analysis*, medRxiv at 5 (Feb. 27, 2020) (finding that even after adjusting for age and

smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary

disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an

ICU, require invasive ventilation, or die).[8]

Should Mr. Naranjo contract COVID-19, the results may be devastating.  "The time

course of the disease can be very rapid.  Individuals can show the first symptoms of infection in

as little as two days after exposure and their condition can seriously deteriorate in as little as five

---

[8] Available at https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf.

days (perhaps sooner) after that."  Stern Decl. at ¶ 4.  "Vulnerable people who are infected by the

COVID-19 virus can experience severe respiratory illness, as well as damage to other major

organs.  Treatment for serious cases of COVID-19 requires significant advanced support,

including ventilator assistance for respiration and intensive care support."  *Id.* at ¶ 6.  "For high

risk patients who do not die from COVID-19, a prolonged recovery is expected to be required,

including the need for extensive rehabilitation for profound deconditioning, loss of digits,

neurologic damage, and loss of respiratory capacity[.]"  Golob Decl. ¶ 4.

As experts predicted, the numbers of positive-COVID-19 cases in BOP are exponentially

escalating:  the BOP today reported 1,692 federal inmates and 349 BOP staff who have

confirmed positive test results for COVID-19 nationwide, not including the 426 inmates and 132

staff who have supposedly "recovered."[9]  These diagnoses are "almost certainly an undercount."

*See* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads*

*Behind Bars*, NY Times (Mar. 30, 2020); *see also* Walter Palvo, *Bureau of Prisons*

*Underreporting COVID-19 Outbreaks in Prison*, Forbes.com (Apr. 1, 2020); *United States v.*

*Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *23 (E.D. Pa. Apr. 1, 2020) (explaining why "[t]he

BOP's [rapidly growing number of] reported cases . . . almost certainly underestimate the true

number of infections"); *United States v. West*, No. 1:17-cr-390-AT-1, Corrected Order

(Redacted) at 4, ECF No. 53 (N.D. Ga. Mar. 30, 2020) (recognizing the BOP's "incomplete

reporting of COVID-19 cases").

Indeed, BOP admitted as much in a congressional briefing held April 7, 2020.  There, the

BOP reported that it lists only positive lab tests, and does not publicly report "open" cases, which

---

[9] It is unclear whether these "recovered" individuals are or were nonetheless contagious when
they were permitted to return to the general population and resume staff duties.

the BOP defines as "suspected, presumed positive, or clinically confirmed." The BOP reported

to Congress that, as of April 7, 2020, there were hundreds of prisoners in isolation (which meant

symptomatic, but not necessarily tested) and thousands of prisoners in quarantine in BOP

facilities across the country, which *were not reported on the BOP website.*[10] It is also possible

that some inmates do not report their symptoms "fearing they may be abandoning in an isolation

cell and left for dead." Kimberly Kindy, *Inside the Deadliest Federal Prison, the Seeping*

*Coronavirus Creates Fear and Danger*, Washingtonpost.com (Apr. 9, 2020)

There have been at least 33 federal inmate deaths attributed to COVID-19 disease. These

deaths will surely not be the last.

> Jails and prison are powder kegs for infection. People in jails and prisons cannot
> practice social distancing, control their exposure to large groups, practice
> increased hygiene, wear protective clothing, obtain specific products for cleaning
> and laundry, avoid frequently touched surfaces, or sanitize their own
> environment. "Realistically, the best—perhaps the only—way to mitigate the
> damage and reduce the death toll is to decrease the jail and prison population by
> releasing as many people as possible." *United States v. Nkanga*, No. 18-CR-713,
> 2020 U.S. Dist. LEXIS 56188, at *1 (S.D.N.Y. Mar. 31, 2020).

*United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). There can be no

doubt that "the COVID-19 virus spreads with uncommon and frightening speed in carceral

settings." *Id.*

Mr. Naranjo is currently incarcerated at USP Coleman II in Sumterville, Florida. He is

confined in close proximity to another inmate in a cell that is approximately 12 by 6 square feet.

The facility is on "lockdown" and Mr. Naranjo is permitted to leave his only cell three days a

week (on Monday, Wednesday, and Friday), for one hour. For the approximately 26 inmates in

his unit, this is the only opportunity to shower each week. During those three hours each week,

---

[10] The BOP website then reported only 253 inmates were infected.

the 26 inmates share approximately 8-10 functioning showers and four computers. The inmates

have been provided with cloth masks. However, only inmates on cleaning duty are provided

with gloves; and the inmates do not have access to hand sanitizer. They are provided with 1-2

bars of soap per month for free. Under these conditions, it is impossible for Mr. Naranjo to

follow CDC social distancing and other important preventative guidelines, particularly for

seniors.[11]

      Just because the BOP website does not, today, report any confirmed cases at USP

Coleman II does not mean there are no cases there. On April 13, the press reported that "*at least

one inmate and one staff member at the Federal Correctional Complex in Sumter County have

tested positive for COVID-19, but internal memos obtained . . . show it might be worse.*"

Stephanie Coueignoux, *Sumter Prison Advocates Fear COVID-19 Cases Underreported*,

Spectrum News (Apr. 13, 2020),

https://www.mynews13.com/fl/orlando/news/2020/04/13/coleman-prison-staff--inmates-urge-

transparency-on-coronavirus-cases (emphasis added). "Three memos sent to staff at the

Coleman complex on April 8 and April 10 detail 'a newly confirmed case of a staff member with

COVID-19' at three separate prison facilities," and the authenticity of the memos were verified

---

[11] The "lockdown" at Mr. Naranjo's facility is ineffective and *more* dangerous for individuals like Mr. Naranjo because COVID-19 is already in community transmission at FCC Coleman. Anastasia Tsioulcas, *Prisoners Across U.S. Will Be Confined For 14 Days To Cut Coronavirus Spread*, www.npr.org (Mar. 31, 2020). The policy does not adequately address: 1) presymptomatic inmate spread (BOP only started quarantining asymptomatic new arrivals on March 26); 2) jail churn (staff keep coming in, contractors keep coming in, inadequate screening of both); 3) numerous exceptions to the lockdown; 4) inadequate sanitation and preventive measures (e.g. lack of masks and no gloves or personal protective equipment); and 5) virtually no testing or contact tracing. Also, "prisoners [have] continued access to commissaries, laundry and showers, as well as to telephones and email." *Id.* While the desire to provide these services to inmates is admirable, it further underscores the impossibility of social distancing and containing this virus in a prison facility.

by "[t]wo independent sources with personal knowledge of the situation." *Id. See also* Laura

Cassels, *In one month, COVID-19 deaths have gone from 0 to 28 in federal prisons; Death count

is 5 at FL state prisons*, Florida Phoenix (Apr. 28, 2020),

https://www.floridaphoenix.com/2020/04/28/in-one-month-covid-19-deaths-have-gone-from-0-

to-28-in-federal-prisons-death-count-is-5-at-fl-state-prisons/ (noting "three prisons in the

Coleman complex" "reported confirmed infections among inmates or employees or both").[12]

On April 17, the press reported that "[t]hree staff members and one prisoner have tested

positive for COVID-19 at the huge Coleman federal prison complex in Sumter County.  But

prison employee and union leader Joe Rojas says you can't trust those numbers from the Federal

Bureau of Prisons."  Joe Byrnes, *Union leader: Officers at Coleman prison complex feel

'sacrificial' during pandemic*, WFME (Apr. 17, 2020), https://www.wmfe.org/union-leader-

officers-at-coleman-prison-complex-feel-sacrificial-during-pandemic/152409.  The prison union

leader explained that the information reported by BOP was not accurate because "they're not

testing inmates" and are requiring a doctor's note before including staff in the official report:

"So, even the numbers for staff are not going to be accurate, because they take their time, they

were waiting to post the numbers.  At FCC Coleman, when we first had a positive COVID-19

staff[,] [i]t took the agency three weeks to post it on the website.  So they're slow-walking it.

We actually have four at Coleman.  I think on the website it only says three[.]"  *Id.*[13]

---

[12] It is unclear how the BOP is associating confirmed positive cases with particular facilities at
the same institutions (such as FCC Butner), and also unclear whether the BOP has administered
any tests at the USP Coleman II facility.  Also, on the BOP website, a staff member is currently
reported positive at USP Coleman I and that staff member may work or interact with staff and/or
inmates at other Coleman facilities on the same premises.

[13] *See also* Neena Satija and Matt Zapotosky, *Amid coronavirus pandemic, federal inmates get
mixed signals about home-confinement releases*, WashingtonPost.com (Apr. 24, 2020) (noting
that prosecutors said the number of suspected cases at FCI Elkton was "about twice" the 100
cases reported on the BOP website).

Any claim that BOP facilities, or USP Coleman II in particular, are safe and/or safer than the community-at-large is demonstrably false.  Courts have acknowledged "[t]he BOP's containment measures have already proven insufficient to prevent the spread of COVID-19," *Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *23.  Both parties in Congress are "concerned about how closely BOP is following CDC guidance or taking other preventative measures to adequately protect BOP staff and inmates from the spread of COVID-19" and "worry that BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities were a highly contagious virus can be easily spread."  Letter to DOJ Inspector General Michael E. Horowitz from U.S. Senators Richard J. Durbin and Chuck Grassley (Apr. 21, 2020); *see* Walter Pavlo, *U.S. Senators Durbin And Grassley Ask Inspector General to Assess Bureau of Prisons Response to COVID-19*, Forbes.com (Apr. 24, 2020).

In addition, "[m]ore than a dozen employees of the federal prison system, including staff in New York and Texas, [said] that their facilities were [] ill-prepared for a coronavirus outbreak, or even a quarantine."  Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, NYTimes.com (Mar. 18, 2020).  BOP staff "described a system that is underprepared for the crisis and already on the brink of disaster."  Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice.com (Mar. 24, 2020) (confirming inmate reports that protocols aren't being followed in several facilities, that inmates are continuing to be transferred, and, per the president of the guard's union, "There hasn't been one inmate who's had his temperature checked in these facilities. The bottom line is people's lives are in danger here. The BOP is dragging its feet on this issue.").

A union representative for correctional officers at the facility where the first BOP inmate died of COVID-19 stated that "the prison bureau has been slow to respond to the crisis across the country."  Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, Washingtonpost.com (Mar. 29, 2020).  At that facility (Oakdale FCI), the officers' union lobbied the federal prison system to [ban family and friend visitation] *for weeks* to keep the disease from infiltrating the prison walls," but the BOP delayed repeatedly and only did so last week; and a prison labor program was only shut down until after the first inmate tested positive.  *Id.* (emphasis added); *see also* Michael Balsamo, *Federal Prisons Struggle to Combat Growing COVID-19 Fears*, AP News (Mar. 27, 2020) (reporting that inmates who demonstrate flu-like symptoms in facilities with confirmed case are not being tested or quarantined, one sought treatment for respiratory illness and was turned away from the medical unit, rec at some facilities is still occurring in groups of 250, and a facility in NY has run out of soap in the staff bathroom).

The emerging consensus among public health experts is that it is absolutely critical to reduce incarceration in order to contain the spread of this virus.  *See, e.g.,* Stern Decl. ¶ 11 ("As a correctional public health expert, I recommend the release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19.").  Shrinking the inmate population "allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees."  *Id.* ¶ 9.  Mr. Naranjo's release from imprisonment would thus help protect both him and the community from

the dangers posed by concentrated populations and community spread.

Courts all over the country, in various procedural postures, are acknowledging the reality
of the danger of COVID-19 in detention facilities and the uncontroverted evidence that it is safer
for the entire community if inmates, like Mr. Naranjo, who are at high-risk of death or injury
from the virus, and who do not pose any immediate danger to others, are released. *See, e.g.,*
*Karr v. Alaska*, 2020 WL 1456469, at *2 (Ct. of App. Alaska Mar. 24, 2020) (citations omitted)
("Incarcerating a defendant under conditions that do not permit compliance with widespread
health directives designed to halt the spread of the virus poses significant health risks not only to
other inmates and to correctional facility staff, but also to the rest of the public.").[14]

Many courts have granted compassionate release motions based, in part, on the COVID-
19 crisis. *See, e.g.*, *United States v. Hammond*, 02-cr-294 (BAH), Mem. Op. & Indicative Ruling

---

[14] *See also United States v. Underwood*, Case No. 8:18-cr-201-TDC, ECF No. 179 (Mar. 31,
2020) (encouraging release to furlough of elderly defendant in BOP custody because, even
though no positive of COVID-19 in his facility, "there is significant potential for it to enter the
prison in the near future"); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020)
(unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly
escalating public health crisis"); *United States v Garlock*, 2020 WL 1439980, at *1 (N.D. Cal.
Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* extending time to self-
surrender: "[b]y now it almost goes without saying that we should not be adding to the prison
population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, 2020
WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of
dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL
1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the
unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re
Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person
will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re
Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020)
(releasing large class of defendants serving time in county jail "in light of the Public Health
Emergency" caused by COVID-19); *United States v. Matthaei*, 2020 WL 1443227, at *1 (D.
Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United
States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending
intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman .
. . is admitted to the inmate population of the Wahoe County Detention Facility").

at 17-18, ECF No. 51 (recognizing that the BOP's "precautions" have not prevented the spread of COVID-19 in prisons and granting compassionate release, reasoning, "the Court cannot turn a blind eye to the rapid spread of a virus to which 'aging' individuals are particularly vulnerable and which is likely far more difficult to contain in cramped prison quarters"); *United States v. McCarthy*, 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (holding that "[t]he defendant's age and medical condition, taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce [his] sentence"); *United States v. Hansen*, 2020 WL 1703672, at *9 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release and reasoning that defendant's "medical risk from the COVID-19 pandemic, taken alone, arguably constitutes 'extraordinary and compelling' circumstances justifying his release"); *United States v. Plunk*, No. 3:94-cr-036-TMB, Order at 8, ECF No. 733 (D. Alaska Apr. 9 2020) ("The Court finds that COVID-19 presents a clear and present danger for individuals who are in custody.  If COVID-19 reaches Defendant's custodial facility, his ability to follow recommended self-care and public health guidance is substantially diminished by the restrictions inherent to his environment. Notwithstanding, Defendant is not expected to recover from deteriorating health because of the aging process.  Therefore, Defendant has presented extraordinary and compelling reasons based on medical conditions in support of his Motion."); *United States v. McPherson*, 2020 WL 1862596 (W.D. Wash. Apr. 14, 2020); *United States v. Samy*, 2020 WL 1888842, at *3-4 (E.D. Mich. Apr. 16, 2020) (recognizing that "COVID-19 is spreading at rapid and unprecedented rates," that "prison populations are subject to heightened vulnerability," and that "the persuasive precedent for granting compassionate release under the current circumstances is overwhelming" and concluding that "[c]ontinuing Samy's incarceration under the current circumstances would be a lethal decision"); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020);

*United States v. Cosgrove*, 2020 WL 1875509, at \*5 (W.D. Wash. Apr. 15, 2020) (reconsidering initial denial and granting compassionate release because, even though defendant's "actions and underlying offense remain reprehensible," defendant's "age, deteriorating health, and chronic heart and liver conditions—were not [previously] considered in the context of the COVID-19 pandemic, where such conditions put him at more significant risk for severe and life-threatening illness"); *United States v. Tran*, 2020 WL 1820520, at \*1 (C.D. Cal. Apr. 10, 2020); *United States v. Muniz*, 2020 WL 1540325, at \*2 (S.D. Tex. Mar. 30, 2020) ("Because Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release."); *United States v. Perez*, 2020 WL 1546422, at \*1 (S.D.N.Y. Apr. 1, 2020) (finding the COVID-19 "threat . . . constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served"); *United States v. Andre Williams*, No. 3:04cr95/MCR, Order at 7, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (recognizing that an outbreak of COVID-19 in Williams' facility would likely have fatal consequences for him" and granting compassionate release to defendant who had served 15 years of a life sentence for repeated (at least six prior) armed bank robberies); *United States v. Edwards*, No. 6:17-cr-003-NKM, Order at 10, ECF No. 134 (W.D. Va. Apr. 2, 2020); *United States v. Ben-Yhwh*, 2020 WL 1874125, at \*4 (D. Haw. Apr. 13, 2020) (granting compassionate to inmate at BOP medical facility with no reported cases of COVID-19, reasoning defendant's "age, underlying health issues that the spread of COVID-19 demonstrate that further delay has a high probability to cause him to suffer catastrophic health consequences, including death").

It does not matter that Mr. Naranjo's request(s) to BOP for compassionate release did not refer to COVID-19;[15] the Court can and should consider Mr. Naranjo's situation today, and that includes the COVID-19 pandemic and his high risk of severe illness or death from the virus.  *See Resnick*, 2020 WL 1651508, at *6 (rejecting the government's "suggesti[on] that this court—which has undoubted jurisdiction because Resnick's original application for compassionate release has been exhausted—cannot take into account things that have occurred since February 26—things that render Resnick's situation even more parlous that it was a month ago" and reasoning, "I would be a fool not to consider what has happened in this country . . . since Resnick originally applied for compassionate release").  Section 3582(c)(1)(A) requires consideration of the section 3553(a) factors and includes consideration of the defendant and his circumstances as they exist at this moment.  *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (holding that a sentencing court must base section 3553(a) analysis on "the most up-to-date picture" of a defendant's history and characteristics).

Waiting for another week, until 30 days have passed since Mr. Naranjo's April 8, 2020 request, which refers to the COVID-19 pandemic, is unnecessary and would also be both prejudicial and futile.  BOP's compassionate release policy does not include consideration of COVID-19, and defense counsel knows of no case in which the BOP has filed a motion for compassionate release since the start of the COVID-19 pandemic.  Nor has BOP created an emergency administrative remedy for prisoners at serious risk from COVID-19.  Seeking such administrative relief is futile.  *Cf. Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1174 (7th Cir. 2010) ("If it takes two weeks to exhaust a complaint that the complainant is in danger of

---

[15] Mr. Naranjo did include COVID-19 as grounds for his compassionate release in his most recent BOP request.  *See* Gov't Ex. A, ECF No. 642-1.

being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust.").  "[U]nder present circumstances, each day a defendant must wait before presenting what could otherwise be a meritorious petition [to the Court] threatens him with greater risk of infection and worse."  *Haney*, 2020 WL 1821988, at *4.

"Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."  *Resnick*, 2020 WL 1651508, at *7.  The risk increases each day that Mr. Naranjo will become seriously ill and die from COVID-19.  Mr. Naranjo's life sentence could soon become a death sentence as the COVID-19 virus spreads through the facilities at Coleman.  The exponential infection rate of COVID-19 and high mortality rate for those with Mr. Naranjo's conditions, coupled with the virtually certain inability of the BOP to address a surge in cases, make clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case.  Accordingly, the Court should exercise its discretion to reduce Mr. Naranjo's sentence.

## III.    Additional Section 3553(a) Considerations Further Support Mr. Naranjo's Release.

Section 3553(a) "requires a sentencing court consider the 'history and characteristics of the defendant' and 'the need to provide the defendant with needed . . . medical care.' . . . Viewed now in light of a raging and virulent pandemic that has entered federal prisons . . . and that poses a special risk to Mr. [Naranjo]'s health, these factors, together, now counsel allowing him to be released . . . ."  *Hernandez*, 2020 WL 1684062, at *3; *see also* 18 U.S.C. § 3553(a)(2)(D) (consideration of providing medical care in the most effective manner).

In addition, Mr. Naranjo has a growth on his forehead approximately an inch above his right eyebrow.  Although he has had this growth for years, it is getting increasingly larger and is now around the size of a golf ball.  It gives him headaches, and causes him to wake up every

morning with eye discharge.  BOP medical providers have not treated the problem.  Thus, the

Court should release Mr. Naranjo to allow him to pursue this and other needed medical care for

his chronic and aging conditions.

Until the facility was put on lockdown, Mr. Naranjo also participated in additional

rehabilitative programming.  He completed a Business Real Estate ACE Class in December

2019.  *See* Exhibit F, Certificate of Achievement.  He also actively participated in the Threshold

Program, a spiritual and values based program taught by chaplains and volunteers over a six to

nine month time period, designed to strengthen an inmate's institutional adjustment and

community reentry efforts.  *See* BOP FY 2017 Performance Budget Congressional Submission at

40-41, https://www.justice.gov/jmd/file/821381/download; Religious Programs, Fed. Bureau of

Prisons, https://www.bop.gov/inmates/custody_and_care/religious_programs.jsp.

At 75 years old, after serving over 40 years in prison, Mr. Naranjo vows to be a law-

abiding citizen if released.  He knows he is "on borrowed time" and realizes that his family,

especially his ailing wife, has suffered from his imprisonment.  He is truly sorry for all the

suffering that he caused, and asks for a chance to "live the rest of [his] remaining life caring for

[his] wife and trying to make up to [his] son and daughter."  Exhibit G, Letter to Court from Mr.

Naranjo (Mar. 16, 2020).

**CONCLUSION**

For the foregoing reasons, Mr. Naranjo respectfully requests that the Court grant his motion and enter an amended judgment reducing his sentence to time-served.

<div style="margin-left:40%;">

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
CELIA GOETZL
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500

</div>